**Jeffrey Scott EHLEN, et al., Plaintiffs,**

v.

**William E. LEWIS, et al., Defendant.**

**Civil Action No. 96–1261.**

United States District Court, District of Columbia.

Oct. 17, 1997.

Martin Lobel, Lobel, Novins & Lamont, Washington, DC, for Jeffrey Scott Ehlen and Carol Ehlen.

Laurence Allnutt Elgin, Washington, DC, for William E. Lewis, Residential Investors Corp. and Frank J. Kroeger, III.

William E. Lewis, Middleburg, VA, pro se.

Robert Gerald Nath, Donald F. King, F. Douglas Ross, Odin, Feldman & Pittleman, Fairfax, VA, Stephen J. O'Brien, O'Brien & Long, Washington, DC, for Stewart Title Guaranty Co.

Blair Gerard Brown, Zuckerman, Spaeder, Goldstein, Taylor & Kolker, L.L.P., Washington, DC, for Reid A. Dunn, and John W. Brady.

Brian Paul Murphy, Griffin, Berenson & Murphy, Washington, DC, for Sheldon L. Ray, Jr.

Sheldon L. Ray, Jr., Washington, DC, pro se.

Lawrence Bradley Bernard, Venable, Baetjer, Howard & Civiletti, L.L.P., Washington, DC, for Mary E. Ray.

William H. Rhodes, Arlington, VA, for 3210 Grace St. Corp. and International Investors, Inc.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

SPORKIN, District Judge.

On allegations including aiding and abetting and a conspiracy to defraud and breach of fiduciary duty, Plaintiffs in this case, Jeffrey Scott and Carol K. Ehlen, seek damages against Defendants Sheldon L. Ray, Jr. ("Ray"), William E. Lewis ("Lewis"), and their respective corporations, International Investors, Inc. ("I.I.I.") and Residential Investors Corp. ("R.I.C.").

### FINDINGS OF FACT

This case was tried by the Court without a jury commencing on September 8, 1997. The Court finds the following facts:

The events underlying this case began in December 1992 when Defendant Sheldon Ray, a real estate salesman, was interested in selling 3210 Grace Street, a property located in the heart of Washington D.C.'s Georgetown. The reported asking price was in the $3,300,000 range. Ray offered the property to Melvin Goodweather ("Goodweather"), Michael Kuse ("Kuse"), and Kuse's brother-in-law, the Plaintiff Jeffrey Scott Ehlen. Although Kuse and Ehlen (who are related by marriage) were joint partners in a real estate holding company ("K & E Holdings"), at these early stages, Ray dealt almost exclusively with Kuse. At some point in April or May of 1993, K & E Holdings dissolved. As part of the split, Ehlen took over the prospective Grace Street acquisition. At this point, Ehlen and Goodweather, with a 99% interest in the partnership that the participants set up to purchase the Grace Street Property, and Ray, with a 1% interest in and as general partner of that partnership, actively pursued the purchase of the property.

After some bargaining, the purchase price agreed on was reduced to approximately $3,000,000. The purchase was to be financed primarily through the assumption of the existing $2,615,000 mortgage on the property held by Dominion Bank with the balance to be financed by a "take-back" loan by the property owner, the Grace Street Limited Partnership (comprised of general partners Reid A. Dunn and John W. Brady, hereinafter "Dunn & Brady"), with the balance being paid in cash. In early February 1993, Dominion Bank indicated it did not want to continue as the mortgage holder of the property. *See* Pls.' Ex. 11. The loan was in default at the time.[1] To save the deal, Defendant Ray managed to find alternate financing—a mortgage loan from Nations bank for $2,250,000, secured by a first deed of trust on the property. *See* Pls.' Ex. 19. Plaintiffs were required personally to guarantee the loan. *See* Pls.' Ex. 19. The remainder of the purchase price—$750,000 plus additional expenses bringing the total to $825,000—was to be made up by a $200,000 capital contribution from each of the two limited partners (Goodweather and Ehlen) and a $225,000 take-back loan from the sellers secured by a second trust on the property. The balance of around $200,000 was to be loaned to the participants by an unidentified mortgage broker known as "the mystery man from Middleburg."[2] He subsequently turned out to be Defendant Lewis.

Defendant Ray acted in several different capacities. First, he was the broker of the transaction, for which he received the customary real estate brokerage commission.[3] He also put together the Limited Partnership that was to purchase the Grace Street Property, for which he was to be the general partner and receive a one percent ownership of the partnership. *See* Pls.' Ex. 25. The breakdown of the interests in the property were: 1% owned by Defendant Ray; 49.5% owned by Plaintiff Scott Ehlen; and 49.5% by the other limited partner Melvin Goodweather.

---

1. Apparently the declination in part was caused by the merger negotiations ongoing at the time between Dominion Bank and First Union Bank.

2. The precise amount of cash to be put in by the limited partners Scott Ehlen and Melvin Goodweather and the exact contribution from the "mystery man" investor, if he invested anything at all, have not been documented in this case.

3. Defendant Ray only had a real estate sales license. At the time of the transaction, he was employed by East West Realty, Inc.

What Defendant Ray did next is the crux of the case: At some point, Ray, who was masterminding the entire transaction, saw a way to increase his take in the transaction. Because the owners of the property were in default of their obligation to the mortgage holder, it occurred to Ray that possibly the bank would sell its mortgage note for less than its $2,615,000 balance. He broached the idea to Lewis, an individual who dabbled in mortgage instruments. According to the proposal made by Ray to Lewis, the plan would be for Lewis to buy the Dominion Bank mortgage note for less than its value, with the difference between the amount paid and the stated value being recouped when the Goodweather/Ehlen partnership completed its purchase of the Grace Street Property for $3,000,000. The final piece of the plan was for Ray and Lewis to split the secret profit on some unspecified basis.

Lewis bought into the scheme and immediately started negotiating with Dominion Bank. Through hard bargaining, he was able to purchase the mortgage note for approximately $1,900,000, which gave him an anticipated profit of some $715,000. This would be realized as soon as the transaction was completed. But the scheme did not end there. The Ehlen/Goodweather partnership was having trouble meeting its end of the bargain. The parties were unable to come up with the cash they were supposed to invest. Again, Ray entered the picture, and along with Lewis and Dunn & Brady, the owner of the property, arranged for a number of bridge loans to place the transaction on course for completion. One wrinkle remained. Lewis did not want to put up any of his own cash for the deal. He wanted it to be risk and cash free.

To implement this scheme, Lewis turned to Frank J. Kroeger ("Kroeger"), an acquaintance who was then the president of Madison Title & Escrow, Inc. ("Madison Title"). Lewis's plan was to have the closings of both his note purchase from Dominion Bank and Plaintiffs' purchase of the Grace Street Property occur on the same day at Kroeger's Madison Title Company. It was Lewis's strategy to effect the transaction simultaneously. In this way, the proceeds from the Grace Street closing would be used to fund the purchase of the Dominion Bank Note. Thus, Lewis would be required to put up none of his own money to reap the windfall profit.

While Defendant Lewis denied on the stand that this was his intent, the circumstantial evidence was overwhelmingly against him. Madison Title was not a well-known title company. It consisted of Kroeger and two partners. The Grace Street transaction was originally scheduled to close at another title company until Lewis entered the picture and insisted that the closing take place at Madison at approximately the same time as the closing of the purchase of the Dominion Bank mortgage note. See Pls.' Ex. 10.

Because there was a slip-up in the closing of the 3210 Grace Street transaction, it could not close on the designated day. What then occurred was that Kroeger improperly made available the funds to Lewis from his title company's escrow account. See Tr. of Kroeger testimony at 18, 51–57; see also Pls.' Exs. 41, 44.

What is particularly disturbing about Lewis's role is that he prepared documents that were contrary to the facts. Lewis had Kroeger sign an agreement that Kroeger would provide Lewis with $2,200,000 in financing. Lewis used the agreement to evidence that his dealings with Kroeger were appropriate in all respects, particularly to show that he, Lewis, had a legitimate source of funds to complete the purchase of the Dominion note. See Pls.' Ex. 17. Kroeger testified that while he signed the agreement, it did not mean anything to him. Specifically, it did not accurately reflect the true nature of the transaction. See Tr. of Kroeger Testimony at 6–11, 15. He said that he was contacted by Lewis, who explained to him he wanted Kroeger to arrange a dual closing. For arranging this, Kroeger was to be paid $100,000.[4] See Pls.' Ex. 17. On probation when he testified, Kroeger had been convicted in an unrelated case for essentially the same activity of dipping into escrow funds. See Pls.' Ex. 87.

---

4. After the transaction, Lewis unilaterally cut Kroeger's take to $70,000. See Pls.' Ex. 51.

When the transaction was finally completed, Defendant Lewis's gross profit on the transaction was approximately $715,000, with a net of around $420,000. Defendant Ray was not as fortunate. He and Lewis did not have a meeting of the minds as to what his share of the secret profit would be. *See* Pls.' Exs. 46, 47, 52, 54, 56, 77, 78, 78A, 79, 85. At one point, Defendant Lewis gave Ray an interest bearing note for $100,000 as his share. *See* Pls.' Exs. 57, 70. After making two interest payments of $3,875 each on the note, one of which was deposited into the Ehlen/Goodweather partnership, no other funds were received by Ray. *See* D. Ray's Ex. 31, 34. Ray went even so far as to sue Lewis for $245,000, his alleged share of the ill gotten gains. *See* Pls.' Ex. 86. He later dismissed the action voluntarily.

## ANALYSIS

### I. *Claims Against Defendant Ray*

### A. *Breach of Fiduciary Duty*

■ The mere recitation of the facts shows this to be a classic case of breach of fiduciary duty. Ray, a licensed real agent for the Plaintiffs Carol and Scott Ehlen, had to know that it was unlawful for him to participate in a transaction from which he was to receive a secret profit.

Defendant Ray owed a duty to disclose and to refrain from taking action that profited him at the expense of his clients. *See* D.C.Code § 45–1934.1(b) (Duties of real estate brokers, salespersons, and property managers); *see also International Underwriters, Inc. v. Boyle*, 365 A.2d 779, 782 (D.C.Cir.1976). Ray's dual role as real estate agent and general partner in the limited partnership formed to buy the property made his clandestine deal with Lewis particularly troubling. The law is "well settled that one partner cannot, directly or indirectly ... take any profit clandestinely for himself." *Latta v. Kilbourn*, 150 U.S. 524, 541, 14 S.Ct. 201, 207, 37 L.Ed. 1169 (1893).

In his defense, Ray argued at trial that he sufficiently disclosed, at least to the extent that Plaintiffs were on notice of the possibility of a Dominion Note buydown. In support of his position, he cited a discussion he had with one of the attorneys of the 3210 Grace Street Partnership and a vague statement he provided to Plaintiff Ehlen's brother-in-law Kuse. Although Ray admitted in his testimony that he at no time discussed the matter with the Plaintiffs, he nevertheless claimed that his actions were sufficient to exonerate him from the charge of self-dealing. *See* D. Ray's Exs. 2–4; Pls.' Exs. 4, 8, 45.

This evidence helps Ray little. According to all the testimony, including Defendant Ray's, it is virtually conceded that the Plaintiffs were at no time provided with the information necessary to make an informed decision. Moreover, Ray's breach of his fiduciary obligations was so egregious that even if he had advised Plaintiffs of his actions in such an off-handed way, it would not have been adequate. Where a fiduciary acts in his own interest in dereliction of his beneficiaries' interest, more than some "by the way" notice is required. Defendant Ray, therefore, must be held responsible for the breach of fiduciary duty.

### B. *Fraudulent Misrepresentation*

■ Similarly, the facts above clearly show the perpetration of fraud by Defendant Ray against the Plaintiffs. Under District of Columbia law, the elements of fraud consist of 1) false representation of a material fact; 2) knowledge of its falsity; 3) intent to mislead another into relying on the representation; 4) reasonable reliance; and 5) injury as the result of reliance. *See Redmond v. Birkel*, 933 F.Supp. 1, 3 (D.D.C.1996) (quotes and citations omitted); *see also Weiss v. Lehman*, 713 F.Supp. 489, 501 (D.D.C.1989). To prevail, Plaintiffs in a fraud claim must prove each and every element by the higher standard of clear and convincing evidence, *see Redmond*, 933 F.Supp. at 3, and the lack of proof on any one of the elements necessarily defeats the claim. *See id.; Wiggins v. District Cablevision, Inc.*, 853 F.Supp. 484, 498 (D.D.C.1994). Although "[p]roof merely of suspicious circumstances is not enough," not every element of fraud and misrepresentation needs to be proven by direct evidence. *See Mills v. Cosmopolitan Insurance Agency, Inc.*, 424 A.2d 43, 50 (D.C.Cir.1980) (Kern, J., dissenting in part, concurring in

part). Since "[f]raudulent misrepresentation frequently is not susceptible to direct proof," the elements of fraud "may be established by reasonable inferences deducible from the evidence." *Id; see also Halberstam v. Welch,* 705 F.2d 472, 486–87 (D.C.Cir.1983).

Under any standard of proof, Plaintiffs prevail. The Court finds that Defendant Ray, with the clear duty to speak, knowingly concealed from Plaintiffs material information on the Grace Street transaction. He did not tell Plaintiffs of his insider deal with Lewis with respect to which he had hoped to profit handsomely at the expense of his beneficiaries. Secret dealing by a fiduciary against the interests of his beneficiaries is forbidden. Plaintiffs appropriately assumed and relied on the fact that their agent and partner would not take any action that would allow their agent to benefit from a secret deal. This is particularly so where the benefit to be received was at their expense. When Ray placed himself in a position clandestinely to join Lewis in Lewis's purchase of the Dominion Bank Note, a fraud was committed on Plaintiffs.

## II. *Claims against Defendant Lewis*

### A. *Breach of Fiduciary Duty*

Under the law, Defendant Lewis fares no better. While he did not have a direct disclosed relationship with the Plaintiffs, he clearly aided and abetted and conspired with Defendant Ray in his actions. Aiding and abetting the breach of fiduciary duty occurs when the defendant "knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other" nonetheless. *Halberstam v. Welch,* 705 F.2d 472, 477 (D.C.Cir.1983). Lewis knew that Ray was Plaintiffs' agent; Lewis knew, or clearly should have known, that Ray's dealings with him constituted a breach of the duty owed by Ray to the Plaintiffs; Lewis substantially assisted Ray in carrying out his scheme secretly to buy the existing mortgage note and reap a profit when the Plaintiffs completed their purchasing of the Grace Street Property.

Civil conspiracy requires the additional, key element of agreement between two or more persons to participate in the unlawful act. *See id.; International Underwriters, Inc., v. Boyle,* 365 A.2d 779, 784 (D.C.Cir. 1976). In this circuit, "[p]roof of a tacit, as opposed to explicit, understanding is sufficient to show agreement." *Halberstam,* 705 F.2d at 477. Defendants Ray and Lewis had such a meeting of the minds. They agreed to enter into a transaction that involved Ray's clear breach of fiduciary duty. Where a third party has actively participated in the breach of fiduciary duty by one owing such a duty, he must be held liable. *International Underwriters, Inc.,* 365 A.2d at 784. Lewis, as well as Ray, must be held responsible for the injury to Plaintiffs from the breach of fiduciary duty.

### B. *Fraud*

Defendant Lewis must also be held accountable for fraud. Lewis clearly aided and abetted and conspired with Defendant Ray to defraud Plaintiffs. Even more so than Ray, his actions in this case were crucial to the completion of the fraud perpetuated on Plaintiffs. A simple recitation of the uncontroverted facts demonstrates this point and the pernicious nature of it. Ray, the Plaintiffs' fiduciary, tipped off Lewis that he had clients who would be entering into a transaction pursuant to which they would be paying off a mortgage loan in default at its full stated value. Lewis secretly bought the note for some $715,000 less than its stated value. He arranged for a simultaneous closing of the property and note sale at a little known and highly suspect title company. When the closing did not go off simultaneously, he improperly arranged a loan from the title company's escrow funds to complete his purchase of the mortgage note. He paid off Ray, the title officer and even the seller of the property, to make it work. What is particularly troubling is that when questioned about his actions before this Court, Lewis misrepresented his role, specifically his arrangement with Kroeger. When added to Lewis "papering" the transaction to make it look legitimate—*i.e.* getting Kroeger to sign a paper purporting to be a loan document, which in

fact, it was not—it is clear that Lewis must be held liable for his actions.

In many respects this is similar to a classic insider trading case. *See Securities and Exchange Comm. v. Texas Gulf Sulphur Co.*, 401 F.2d 833 (2d Cir.1968) (en banc); *cert. denied* 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969); *In re Cady, Roberts & Co.*, 40 SEC 907 (1961). Ray provided Lewis with information that he had a client who would be paying the stated value to extinguish a mortgage note. Armed with this information, Lewis bought the note at a deep discount with the understanding he would share some of the proceeds with Ray. Lewis and Ray then orchestrated a closing of the two transactions so that Lewis would be able to obtain his profits on a risk free basis. After Lewis purchased the note on the basis of secret inside information, he took steps to cover up his role in the fraudulent transaction.

What makes Lewis's part even worse is that he was untruthful in his testimony before this Court. There was no way in which the testimony of Defendant Lewis could be reconciled with that of Kroeger. Although Kroeger is a convicted felon, this Court credits his testimony. Lewis wanted a sweetheart deal without risk and without putting up any cash. The easy way Lewis found this could be accomplished was for Kroeger to front the money from his title company's escrow account. This is precisely what Kroeger did. Lewis was not only an aider and abettor, but a principal in the fraud perpetrated against the Plaintiffs. Thus, this Court holds that both Defendants Lewis and Ray are liable for the injuries caused by the breach of fiduciary duty and fraud.[5]

### III. *Damages*

Plaintiffs seek $1,484,602 in out-of-pocket expenses caused by Defendants' fraud, plus attorneys' fees and expenses in this and related litigation.

It is clear that Plaintiffs, at a minimum, are entitled to the difference between the price Defendant Lewis paid for the Dominion Bank Note and what Plaintiffs paid, with interest. More than that, this Court believes that the fairest way of apportioning damages would be to require both Defendants Ray and Lewis to disgorge all monies they received in the insider transaction. *See Weiss v. Lehman*, 713 F.Supp. 489, 505 (D.D.C. 1989). This means that Lewis will be ordered to disgorge $715,000, the difference between the price he paid for the Dominion Bank Note and the price paid to extinguish it. He will be given no credit for the monies spent in carrying out his scheme. Ray will be required to disgorge the monies he received from Lewis, his $60,000 real estate commission, and any management fees he might have received from the Grace Street property for violation of his fiduciary duty.

Plaintiffs are also entitled to recoup the legal fees incurred in vindicating their rights in this case. This case involved outright fraud. There were no mitigating circumstances. The acts of Defendants were intentional and contrary to law. Because of the knowingly malicious nature of Defendants' actions, this Court believes that legal fees should be paid to Plaintiffs' counsel as one of the measures of damages that the Plaintiffs suffered. *See Washington Medical Center v.*

---

5. In closing argument for the first time, Defendants raised the additional defense that the Limited Partnership, not Plaintiffs, should have been the proper party to bring this suit. In the alternative, they argued that Melvin Goodweather, the other limited partner, at least should have been joined as an indispensable party to the case. They continued to advance these arguments in their post-trial briefs. The Court rejects these claims for several reasons. First, these arguments were not timely made; they clearly should have been raised by Defendant Ray prior to the commencement of the proceedings. Second, many of the wrongful acts by Defendants were perpetrated against Plaintiffs prior to the formation of the Limited Partnership, and despite the formation of the partnership, Plaintiffs signed personal guarantees on the NationsBank loan to buy the property. As their real estate agent, Ray owed a fiduciary duty to Plaintiffs as individuals well before he became a general partner to the limited partnership. Although the partnership and Goodweather also suffered injury, they are not before this Court and whatever interest they have must be presented in actions brought by them. It is to be noted that Goodweather testified at trial that the reason he did not join in the present lawsuit is because he lacked funds to pay the legal costs. Because of Defendants' actions, this Court cannot allow the wrongdoers to benefit because not every possible plaintiff sued.

*Holle,* 573 A.2d 1269, 1284 (D.C.Cir.1990). Plaintiffs could not have vindicated their rights without the able assistance of lawyers.

The Court is not prepared to include in the measure of damages Plaintiffs' legal expenses in proceedings other than the present one before this Court. While courts have some discretion in determining where to cut off the recoupment of legal expenses, this Court believes the line to be drawn in this case should be limited to the expenses incurred in the present litigation. This is partly because the Court presided over the trial and was able to observe the appropriateness of the litigation expenses incurred.

The judgment against Defendant Ray will be in the sum of $63,875 plus the Plaintiffs' attorneys' fees and costs to be submitted to the Court in this case. And the judgment against Defendant Lewis will be in the sum of $715,000 plus the Plaintiffs' attorneys' fees and costs to be submitted to the Court in this case. While the liability on the disgorgement will be on an individual basis, responsibility for paying Plaintiffs' legal fees and costs will be both jointly and severally. An appropriate Order follows.

Within 15 days of the Order attached, Plaintiffs will submit their attorneys' fees and costs related to this case; Defendants will have 5 days to reply. This Court shall retain jurisdiction to oversee the final disposition of this matter.