**Richard JENKINS, Appellant,**

v.

**William D. STRAUSS, Appellee.**

No. 03–CV–930.

District of Columbia Court of Appeals.

Argued Dec. 8, 2005.
Decided Aug. 23, 2007.

Bernard A. Gray, Sr., Washington, District of Columbia, for appellant.

Othello G. Jones, Jr., for appellee.

Before GLICKMAN, KRAMER and FISHER, Associate Judges.

KRAMER, Associate Judge:

The appellant, Richard Jenkins, is challenging the trial court's verdict following a non-jury trial holding that he had breached his fiduciary duty as a real estate agent and awarding damages to William Strauss in the amount of $24,842.97. Jenkins makes several claims of error on appeal. We conclude that none warrants reversal of the trial court's decision and affirm.

## FACTUAL BACKGROUND

### Hiring Jenkins as a Real Estate Agent

In December 1996, William Strauss, about eighty years old and suffering from Alzheimer's disease, conferred power of attorney on his younger brother Benjamin Strauss, who was then about seventy-six years old.[1] In 1998, as the disease progressed, William moved from his home at 4247 Nash Street in Northeast Washington to a nursing facility. Thus, Benjamin determined that his brother's home, which had no mortgage encumbering it and was in "very good condition," should be sold to fund his nursing home care. Toward this end, in January 1998, Benjamin, on behalf

---

1. For the sake of simplicity, the brothers will henceforth be referred to as William and Benjamin.

of his brother, sought the assistance of Richard Jenkins, with whom he had been casually acquainted through their church for many years. Jenkins was a long-practicing real estate agent and the owner of Jenkins Realty. He agreed to represent the brothers in the sale of the Nash Street house.

### Terms of Sale Dictated by Benjamin and the Listing Agreement

The house was appraised at $136,000 and Benjamin testified that he made clear to Jenkins that he "wanted at least $120,000 out of the house ... in a lump sum," that is, in cash. He also testified that he explained to Jenkins that this was because of the need to cover his brother's nursing home expenses and because both brothers were of advanced age. Benjamin testified that although he "gave permission" to Jenkins to sell the Nash Street house, Jenkins never presented him with any written listing agreement to sign, testimony corroborated by his wife, who was present at the time of the original discussion. Benjamin also testified that while he knew that Jenkins would be entitled to a commission for the sale, he was not told what it would be. William Evans, the real estate expert called in the Strausses' case, testified that the standard of practice is for the real estate agent to prepare a written listing agreement.

Jenkins testified with respect to the listing agreement, at first claiming that he was unable to locate a copy of the listing agreement for the Nash Street house, although asserting, "I did have one." After Evans' testimony, while testifying in his own case, Jenkins had an amplified recollection of the preparation of the listing agreement. He testified that Benjamin had approached him and told him that he was interested in selling his brother's house, that he met Benjamin and his wife at William's house after church, and that Benjamin said he wanted around $120,000 to $125,000 for the house. Indeed, Jenkins even recalled that he was carrying his "old briefcase with him," and that he "wrote up a listing." He testified, however, that he could not recall whether or not he had actually given Benjamin a copy of the listing agreement.

On cross-examination, Jenkins' testimony with respect to the listing agreement changed considerably. When asked whether there was anything in the listing agreement that would have provided that the seller would pay certain creditors of the purchaser, or that the seller would provide "six percent help to whoever the purchaser is toward the purchase cost," he was unable to recall. At a later point during this cross-examination, his recollection with respect to his writing up a listing agreement shifted yet again, and he testified that while it was his general practice to write up a listing, "I don't know whether I did it that Sunday [presumably when he met Benjamin at William's home] or not."

### Sales Agreement

Within a few months, Jenkins secured a buyer, Jacqueline Brooks, who offered to purchase the property for $130,000, an offer that Benjamin accepted on behalf of William. Benjamin testified that not only had Jenkins never presented him with a listing agreement, but he had also never seen what was produced at trial as the sales contract for the property until after the sale, when the attorney that he had hired to look into this matter showed it to him.

Like the listing agreement, Jenkins was unable to produce the sales contract used as the basis for the settlement and testified that he was unsure that he had ever given a copy of it to Benjamin. To explain his inability to produce either the listing agreement or the sales contract, Jenkins

asserted that before this lawsuit was filed, all of his documents and other papers had been destroyed by tenants living in one of his rental properties. Indeed, he testified that they "threw all [his] records away, threw everything in the house out." In its order, the trial court specifically rejected that testimony, noting:

> The Court sees no reason why tenants would destroy a landlord's personal records and rejects this bald assertion as incredible. Additionally, the Court notes that the manner in which Mr. Jenkins delivered this statement demonstrated his own lack of belief in these words.

[Order at 2, n. 3]

While no listing agreement was ever produced, a copy of the sales contract was located in the files of CV Title Group, a real estate title and settlement company located in Silver Spring, Maryland, that had handled the settlement. Following Jenkins' original testimony, Evans, the Strausses' expert, testified that the standard of practice in the real estate business is that the seller (or the person holding the seller's power of attorney) must sign a sales contract. As he explained, it is generally the agent who will prepare the sales contract and who has the responsibility to explain the terms and conditions of the sale to the seller. The sales contract, dated April 10, 1998, bears what purports to be the signatures of the buyer, Jacqueline Brooks, as well as of William Strauss and Benjamin Strauss. "Jenkins Realty" was listed as the real estate agent and Jenkins admitted that "Jenkins Realty" was synonymous with him.

Benjamin testified that the signatures of himself and his brother at the bottom of this contract were invalid. As he explained with respect to William's signature, "First thing, he was in a [nursing] home at that time. And also, he doesn't write his name in that manner right there.

He doesn't write it W–I–L–L–I–A–M. He writes his name W-m. D. Strauss. . . . That's not his signature at all." Benjamin also testified that he took no papers to William for his signature. As he put it, "My brother was not able to sign anything. He was in a home and he had Alzheimer's a few years. So, I wouldn't take any papers to him for him to sign anything." With respect to his own signature, he testified that it was not his signature either, clarifying, "I don't make H's that way. I don't make my J's that way. And I don't make my N's. . . . That's not my signature."

In addition to what Evans testified were standard terms for such a sales contract, the contract included several terms that he described as not being standard. First, the contract provided, "Seller agrees to pay Purchaser[']s accounts with Sears, Wards and Norwest in full." Benjamin testified that he never agreed to this provision. Indeed, as Evans testified, the provision for payment of Brooks' outstanding accounts was not in accord with real estate standards, particularly since it was open ended and had no cap on the amount of money the seller might have to pay. Under this provision, Evans explained, Brooks could have incurred substantial additional obligations to Sears, Wards and Norwest between the date the sales contract was signed (April 10, 1998) and the date of settlement (May 26, 1998), and William, despite his costly medical needs, would have had to pay them from the proceeds of the sale. In fact, he ultimately did pay these accounts from the proceeds. The sales agreement also included a term that the seller "agrees to pay 6% of sales price toward costs." Benjamin testified that he never would have agreed to take money from the proceeds of the sale of William's home to pay Brooks' consumer accounts, nor to allow 6% of the sales price to be applied to her costs. In fact, Benja-

min testified that if Jenkins could not secure a buyer without such terms, then he would not sell and would find another agent/broker, since both brothers were elderly and William was in a nursing home needing care.

The contract also provided: "The purchaser is to assume, give, place, take title subject to, a first deed of trust secured on the premises of 4247 Nash Street, N.E. in the amount of ... $97,500." Further, it provided that "[t]he balance of deferred purchase money is to be secured by a second deed of trust on sale property, to be paid in monthly installments ... per agreement between Seller and Purchaser." Ultimately, the second deed of trust placed on the Nash Street house was for $32,500, an amount that was deducted from the proceeds of the sale. Benjamin testified that he had never agreed to this trust being placed on the Nash Street house. Moreover, he testified that had he known that Jenkins was not able to arrange a sale that resulted in receiving the proceeds from the house in a lump sum—that is, all cash—he would have gone to a different agent given the needs of his brother. As the expert Evans testified, if there is a trust, it is not an all cash transaction.

### Dual Agency

Moreover, by his own admission, Jenkins was "acting as a dual agent," representing Brooks as her agent in the sale of both her home and her purchase of William Strauss' property, while at the same time representing William in the sale of his home. Benjamin testified that he had no knowledge of this dual representation, knew of no relationship between Brooks and Jenkins, and was not aware that Jenkins was also selling her house. Jenkins, on the other hand, testified that he told Benjamin that "Ms. Brooks was my client and that she was the purchaser of the house." [163] Thus, Jenkins testified, "He knew that I was representing Ms. Brooks as well as representing him. He *should have known* that I was in a dual capacity."

Evans, however, explained that to protect both the buyer and the seller, it is the standard of practice in the real estate business to disclose a dual agency relationship in writing to both the purchaser and the seller. As he put it, "serving two masters is rather difficult unless both masters know that you are serving them [and] the only way to do that in real estate is in writing." Nonetheless, Jenkins did not do so, and the record makes clear that Benjamin did not understand the implications of Jenkins' dual representation. Benjamin's confusion was further exacerbated by the fact that the record indicates that Jenkins never gave him a copy of the sales contract setting out the troublesome provisions that would have been contrary to what he wanted—a sale that provided him with a lump sum in the amount of at least $120,000.

### The Settlement

Jenkins arranged for C.V. Title Group to handle the settlement of the property, with Claudette Winstead as the settlement agent. The settlement was held on May 25, 1998, and Jenkins notified Benjamin one day in advance. Benjamin went with his wife to C.V. Title Group's offices for the settlement, but upon his arrival he was told that he needed to have his power of attorney documents with him in order to effectuate the sale (a fact that Jenkins had not told him beforehand). Thus, rather than remaining during the settlement he and his wife had to leave to procure the power of attorney document from their home, which was in Columbia, Maryland. In their absence, the settlement, proceeded without them. By the time they returned, the settlement was essentially over.

Benjamin testified that Jenkins advised him that in order to receive the proceeds

from the settlement, he needed to sign the settlement sheet (which was introduced into evidence) in two places to complete the transaction. Benjamin did so, signing each time with the signature "William D. Strauss By Power of Attorney Benjamin H. Strauss." He testified that this is the form of signature he regularly employed when acting on behalf of his brother. Because the settlement was over, Benjamin explained, and because he trusted Jenkins, he "took for granted that everything was fine." Thus, he did not read the terms on the settlement sheet, did not agree to them, and did not learn of the monies to be deducted from the settlement proceeds for Brooks' expenses. Even Jenkins admitted that he "perhaps told Mr. Strauss to sign, that it was all right for him to sign the settlement sheet," but added that he "took [his] time explaining it to him." From the settlement proceeds, Jenkins received his 6% sales commission for selling the Nash Street house, and another 6% sales commission for selling Brooks' house.

The settlement sheet showed a number of deductions benefitting Brooks that were taken out of the $130,000 sales proceeds that added up to $59,580.47. One group of deductions, totaling $9,162.97, was for payment of her bills to Norwest and Sears in the amounts of $2,650 and $3,321.18 respectively, plus $3,000 toward her moving expenses and $191.79 toward her property taxes. Another deduction, amounting to $7,880, was listed as going "toward costs," and covered the commission that Brooks owed to Jenkins for the sale of her own house. A third, in the amount of $32,500, was for the second trust referred to above. A further deduction in the amount of $7,800 [2] was for Jenkins' commission on

the sale of the Nash Street house. After all of the deductions from the $130,000 sales price, the settlement sheet reflected that William would be entitled to only $70,419.53 from C.V. Title Group from the sale of his home—considerably less than the $120,000 of proceeds that Benjamin had told Jenkins was the minimum that must be realized from the sale.

About two weeks thereafter, Benjamin received a check in the amount of $70,419.53. He contacted Jenkins to inquire about when he would receive the remaining balance from the sale. Jenkins told him that he would receive the remainder of the money within thirty to thirty-five days. Because his brother's money was low, and because he trusted Jenkins' word that he would receive the remainder of the funds within thirty to thirty-five days, Benjamin accepted the check. After three months, when he still had not received the funds, he contacted an attorney. His attorney's investigation unearthed the sales agreement discussed above.

In a letter from Jenkins to Benjamin dated December 1, 1998, months after the settlement, Jenkins informed Benjamin that another trust for $6500 had been placed on the property in order to cover some of Ms. Brooks' additional costs. Although Jenkins testified repeatedly that Benjamin knew he was trying to sell Brooks' house also,[3] Jenkins never claimed that he obtained Benjamin's acquiescence for this trust, and Benjamin specifically denied that Jenkins ever explained this to him beforehand or ever obtained his agreement. Indeed, both the $32,500 trust reflected on the settlement sheet and this $6,500 note were in specific violation of

---

**2.** This $7,800 sales commission should not be confused with the $7,880 deduction that amounted to 6% of the sales price that went "towards costs" and was used to pay Jenkins' commission on the sale of Brooks' house.

**3.** This testimony came as non-responsive answers to questions posed by counsel representing William and Benjamin Strauss.

Benjamin's direction that this was to be an all-cash transaction for the purpose of insuring that there were sufficient funds to pay the costs of nursing care for William.

Thereafter, Benjamin filed a civil suit in the Superior Court on behalf of his brother, naming Jenkins, C.V. Title Group and Brooks as defendants. Brooks and C.V. Title Group were dismissed before trial. Thus, by the time of the trial, Jenkins, who was proceeding *pro se,* was the only remaining defendant.

### Trial Court's Decision

Subsequently, the trial court issued a decision ruling that Jenkins had breached his fiduciary duty to William and entering judgment in William's favor. This verdict was based upon four key findings. First, in violation of D.C.Code § 42–1705 (2001), Jenkins "failed to obtain a written listing contract." Second, in violation of D.C.Code § 42–1703(i) (2001), Jenkins "failed to obtain written consent for dual representation in the real estate sales transaction in question." Third, Jenkins "acted contrary to the authority vested in him by [Benjamin Strauss] in negotiating terms of the sales contract that conflicted with [William Strauss'] interests." Fourth, Jenkins "committed fraud in that he forged the signatures of [William and Benjamin Strauss] on the April 10, 1998, Sales Agreement."

Jenkins, now represented by counsel on appeal,[4] claims that the trial court erred in two of its key factual findings—first that he had prepared the sales agreement, and second that he had committed fraud by forging William and Benjamin Strauss's signatures on the sales agreement. Consequently, he argues, the trial court's finding of fraud is unsupported by the evidence. Thus, we must review the trial court's findings of fact and conclusions of law.

In reviewing a non-jury trial, while we "may review both as to the facts and the law … the judgment may not be set aside except for errors of law unless it appears that the judgment is plainly wrong or without evidence to support it." D.C.Code § 17–305(a) (2001). Moreover, "a trial court's findings of fact will not be disturbed unless they are clearly erroneous," and, of considerable significance here, "due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." *Crescent Props. v. Inabinet,* 897 A.2d 782, 790 (D.C. 2006) (quoting *Zoob v. Jordan,* 841 A.2d 761, 764 (D.C.2004); *Wright v. Hodges,* 681 A.2d 1102, 1105 (D.C.1996)) (internal quotations omitted). While we conclude that the trial court misremembered some of the testimony that supported its finding of fraud, we nevertheless hold that the evidence amply supports the finding that Jenkins breached his fiduciary duty to the Strauss brothers.

### BREACH OF FIDUCIARY DUTY

#### Listing Contract

The overarching conclusion of the trial court was that Jenkins had breached his fiduciary duty to the Strausses. We conclude that there was ample evidence to support that finding. THE RE-

---

4. We note that Jenkins was not represented by counsel at trial. While he faults the trial judge for denying him a continuance of the trial so that he could obtain counsel, particularly after CV Title was dismissed as a party, there had been ample time for Jenkins to obtain counsel, and the trial court was acting squarely within its discretion in denying his request. *See Fischer v. Estate of Flax,* 816 A.2d 1, 8 (D.C.2003), citing *Dobbs v. Providence Hosp.,* 736 A.2d 216, 221 n. 8 (D.C. 1999) (quoting *Moctar v. United States,* 718 A.2d 1063, 1065 (D.C.1998)) (" '[T]he grant or denial of a continuance rests within the sound discretion of a trial judge, to whom we accord a wide latitude.' ")

STATEMENT (THIRD) OF AGENCY § 1.01 (2006) provides that a "fiduciary relationship arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act." This agency relationship "creates the agent's fiduciary obligation as a matter of law" and the fiduciary "must act loyally in the principal's interest as well as on the principal's behalf." *Id. cmt. e.* Indeed, "[t]he fiduciary duty owed by a real estate agent ... requires the exercise of the highest fidelity toward the principal. It encompasses an obligation to inform the principal of every development affecting his interest...." *Vicki Bagley Realty, Inc. v. Laufer,* 482 A.2d 359, 364–65 (D.C.1984). Moreover, in the District of Columbia, a real estate agent is required by D.C.Code § 42–1705 (2001) to memorialize the terms of the agreement in a "written listing contract ... for the sale of all real property," and if the agent does not do so, he or she "shall not receive payment of a commission."

◼ In this case, as the trial court found, when Jenkins agreed to Benjamin's request that Jenkins find a buyer for William's home, an agency/fiduciary relationship was created and the terms of that agreement should have been put in a written listing agreement, but were not. Nonetheless, the court, relying on *Fred Ezra Co. v. Pedas,* 682 A.2d 173, 177–78 (D.C.1996), correctly found that an enforceable oral contract was created and formed the basis for the fiduciary obligation owed by Jenkins to the Strausses. Moreover, as the trial court also found, the terms of that oral contract were clear, that is, the duty to secure an all-cash sale of the Nash Street house which would yield an amount no less than $120,000 in cash. Jenkins was on notice that this was critical, since the money was needed to cover the expense of William's care. If Jenkins complied with these terms, he would be entitled to a commission on the sale of the property. The court found, however, that Jenkins never memorialized these terms in a written listing contract, and concluded that the absence of a written listing contract was "a factor demonstrating [Jenkins'] cavalier attitude toward his client's trust and financial interests," factors that bear directly on whether Jenkins breached his fiduciary duty to the brothers.

### No Written Consent for Dual Representation

The court also concluded that Jenkins failed to obtain written consent for dual representation with respect to the real estate transactions at issue. This finding also is amply supported by the record. The evidence showed that, despite the statutory requirement that dual representation by a real estate broker be conditioned on the existence of "written consent of all clients to the transaction," D.C.Code § 42–1703(i)(1) (2001),[5] Jenkins failed to obtain such written consent. As the court found, at best, according to Jenkins' own testimony, he orally informed Benjamin that he was also selling Brooks' house.

---

5. Specifically, § 42–1703(i)(1) provides:
 A licensee may act as a dual representative only with the written consent of all clients to the transaction. Such written consent and disclosure of the brokerage relationship as required by this section shall be presumed to have been given as against any client who signs a disclosure as provided in this section.

§ 42–1703 (i)(2) provides:
Such disclosure may be given in combination with other disclosures or provided with other information, but if so, the disclosure must be conspicuous, printed in bold lettering, all capitals, underlined, or within a separate box.

But as the court pointed out, quoting *Ehlen v. Lewis,* 984 F.Supp. 5, 9 (D.D.C.1997), "Where a fiduciary acts in his own interest in dereliction of his beneficiaries' interest, more than some 'by the way' notice is required."

"By the way notice" appears to be precisely what Jenkins gave. While Benjamin testified that he was unaware of the dual relationship, Jenkins testified that Benjamin "knew that I was representing Ms. Brooks as well as representing him. He *should have known* that I was in a dual capacity." The phrase "should have known" is in itself an implicit acknowledgment that Jenkins had failed to disclose fully the dual nature of the relationship. Providing further corroboration is Jenkins' own testimony that he "usually doesn't go into a lot of details about dual relationships."

Evans testified that apart from the statutory requirement, to protect both the buyer and the seller, it is the standard of practice in the real estate business that dual agency be disclosed in writing to the purchaser and seller. As he put it, "serving two masters is rather difficult unless both masters know that you are serving them [and] the only way to do that in real estate is in writing." Moreover, the record makes clear that Benjamin surely did not understand the implications of Jenkins' dual representation, and that he was clearly in need of exactly what Jenkins failed to do, which was to provide him with the written notice required by statute.

Furthermore, the terms of the settlement, including obtaining payment out of the proceeds of the sale of the Nash Street house to pay off Brooks' consumer accounts and her property taxes; receiving 6% of the proceeds of the sale towards the costs of the settlement; and placing a mortgage on the property in the amount of $32,500—terms that Evans testified were highly unusual and that were in direct conflict with Benjamin's goal to realize at least $120,000 from an all-cash transaction—vividly illustrate the consequences that can occur as a result of an inadequately disclosed dual representation. As the court appropriately concluded, in these circumstances, even an oral explanation would simply be inadequate to acquire the truly informed consent of both parties.

 In *Urban Invest., Inc. v. Branham,* 464 A.2d 93 (D.C.1983), we wrote:

> Because a broker is charged with protecting and advancing the principal's interests, a broker thus may not serve both parties to a transaction unless, under certain circumstances, the parties fully and freely have consented to the dual representation.... If a broker attempts to act for both sides, he is confronted with the impossible task of securing for each the most advantageous bargain possible.

*Id.* at 96 (citations and footnote omitted). Thus, the trial court, explicitly rejecting Jenkins' claim that he was acting "as a mere middleman" in the real estate transaction, instead found that Jenkins' actions with respect to this dual representation violated the fiduciary duties he owed to the Strausses, including negotiating the most favorable terms possible for them. This finding is amply supported by the record.

### Acting Outside the Scope of Authority and Breaching the Terms of the Contract

Third, the court found that Jenkins acted outside the scope of his authority and breached the terms of the oral contract by not obtaining an all-cash transaction that would yield at least $120,000. Indeed, Jenkins acted directly contrary to his obligation to provide "the highest fidelity toward the principal." *Vicki Bagley Realty, Inc., supra,* 482 A.2d at 364–65. As discussed above, rather than follow the

directions Benjamin gave him, Jenkins reduced the proceeds from the sale substantially below the $120,000 minimum that Benjamin had specified through the payments taken from those proceeds to pay Brooks' consumer accounts, property taxes, settlement costs and through the imposition of a mortgage on the Nash Street house. In the end, rather than the $120,000 Benjamin believed necessary for his brother's care, the proceeds were a mere $70,419.53, nearly $50,000 less than what he instructed Jenkins was the minimum acceptable amount. Jenkins appeared to have been motivated to do this not because there would be any benefit for the Strausses, nor because it was difficult to sell the house for a greater amount,[6] but rather because of a desire to realize two commissions, rather than one, from this double transaction. As the trial court wrote, "It is a well-established legal principle that an agent who fails to exercise standard care and commits an act not authorized by his principal is liable for damages arising from that act." (citing *Max Holtzman, Inc. v. K & T Co.,* 375 A.2d 510, 514 (D.C.1977)).

### Jenkins' Preparation of the Sales Contract

Jenkins contends that there was insufficient evidence for the court to conclude that he had prepared the sales agreement. We disagree. The trial court found specifically that Jenkins "prepared a [sales contract] dated April 10, 1998," and noted that he "testified, under oath, that he prepared the sales agreement." There is no error in this finding.

The record shows that when called as an adverse witness in the Strausses' case and asked who had typed up the sales contract, Jenkins first testified, "I don't know who typed it up. The girl, I don't know whether the girl typed it up or whether I typed

it up." Although not precisely the same as the trial court's finding that Jenkins testified under oath that he prepared the sales contract, it sufficiently supports a finding that either he typed it himself, or he had "the girl" (an expression that strongly suggests a person who worked at his direction) type it up under his direction. Indeed, either way, it would fall comfortably within the definition of preparation of the sales contract, and whether he had it typed by "the girl" or typed it himself would make no difference. In either case, he would be responsible for its contents. *See, e.g., Schecter v. Merchs. Home Delivery, Inc.,* 892 A.2d 415, 427 (D.C.2006) (employers are responsible for acts "done in the prosecution of the business either impliedly or expressly intrusted to the agent" (quoting *Axman v. Washington Gaslight Co.,* 38 App.D.C. 150, 158 (1912))). Thus, the trial court had a sufficient basis for its finding that Jenkins testified under oath that he prepared the sales contract.

The fact that he also gave contrary testimony is not determinative. Indeed, in later testimony addressing the issue of who prepared the sales contract, Jenkins wavered considerably. This wavering testimony, arguably self-protective and inconsistent with his original answer, provided a further basis for the court to conclude that Jenkins was concerned about blame being placed upon him for preparing this agreement and wished to deflect that blame elsewhere. Indeed, in this later context, when counsel asked the followup question: "Did you either prepare this contract or cause it to be prepared by somebody," Jenkins backtracked, testifying, "I don't know whether or not I prepared this particular contract or not.... *Anybody could have prepared this contract because Mr. Strauss said this is not his signature.*" (emphasis added)

---

**6.** There is absolutely no evidence to that effect in the record.

Moreover, in response to a question about whether "this was the contract that was used to sell Mr. Strauss' home," Jenkins responded, "I don't know if this was the particular contract or not. But those are the terms in there. Mr. Strauss read this at the title company.[7] He knew what he was signing."

Jenkins later backed off further from his original testimony that either he or "the girl" typed it up, asserting "I know I didn't prepare it." This was despite the fact that the agreement had the name of Jenkins Realty in three places on the document, and that Evans testified that it is generally the agent who will prepare the sales contract. In fact, Jenkins ultimately testified that "[a]nybody could have prepared this particular contract," and suggested that when Benjamin left the settlement to get the power of attorney documents, "he could have come back with this."

The trial court was entirely justified in rejecting this testimony. The idea that Benjamin might have prepared this agreement, with terms antithetical to his purpose of selling the Nash Street home, is simply not credible. Moreover, it is apparent that Benjamin was unaware of and never approved the terms of this sales contract. His testimony about his sense of obligation toward his brother and his concern that there be sufficient funds to cover William's nursing home expenses was in no way impeached. The idea that Benjamin would agree to reduce the proceeds due his brother by paying consumer accounts in undefined amounts for the buyer of the Nash Street house, as well as the buyer's taxes and settlement costs, and permit a sale with a trust in the amount of $32,500 runs counter to the very purpose of this sale. In fact, when asked whether he accepted the term that involved paying off Brooks' consumer accounts, Benjamin re-

sponded: "Oh, I would have never accepted that.... [T]hat would have been a dumb thing to do with someone else's money." The same is true with respect to the payment of her taxes, her settlement costs and the commission on the sale of her house and permitting a trust for $32,500 to be placed on the property. In the end, the terms of the sales contract benefitted Jenkins (and to a lesser extent Brooks), not the Strausses. That is an additional factor supporting the court's finding that it was indeed Jenkins who drew it up.

■ In a non-jury trial, it is the trial court that must make credibility determinations. Such determinations may be either the result of conflicting testimony of different witnesses or conflicting testimony of a single witness. *See, e.g., Williams v. United States,* 595 A.2d 1003, 1006 (D.C.1991) ("Assessing the credibility of witnesses is uniquely a trial court's function, and we reverse only if we find those assessments plainly wrong or lacking evidentiary support."). Here, Jenkins contradicted himself, and the court had the obligation to decide which part of his testimony, if any, it chose to credit. We decline to second guess that decision.

### FRAUD

■ The court also found that Jenkins forged the signature of Benjamin Strauss on the sales contract and that this was "an obvious fraudulent act." Specifically, the court wrote: "Because of Defendant's own admission that the signatures were not those of [William or Benjamin Strauss]," it found that the sales contract was a forgery. This finding was premised on the court's erroneous recollection of Jenkins' testimony, which admittedly was quite confusing. Contrary to the trial court's find-

---

7. At another point in his testimony, however, he expressed uncertainty about whether or not he had ever given Benjamin a copy of the sales contract.

ing, Jenkins never testified that the signatures on the contract were not those of William and Benjamin Strauss.[8] The closest he came was his testimony, "I don't know whether or not I prepared this particular contract or not.... Anybody could have prepared this contract because Mr. Strauss said this is not his signature." Because of the court's mistaken factual finding on this point, we must decide whether or not to reverse and remand this matter for a new trial, the remedy sought by Jenkins.

■ At issue is whether this erroneous finding affected the "substantial rights of the parties." *See* D.C.Code § 11–721(e) (appellate court "shall give judgment after an examination of the record without regard to errors or defects which do not affect the *substantial rights* of the parties" (emphasis supplied)). In evaluating whether the error affected "substantial rights," we use the standard articulated by the Supreme Court in *Kotteakos v. United States*, 328 U.S. 750, 764–65, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), which is whether, "when all is said and done, .... [we can] say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." Discussing *Kotteakos* in *R. & G. Orthopedic Appliances & Prosthetics, Inc. v. Curtin*, 596 A.2d 530, 539 (D.C. 1991), we wrote: "[t]he test is not whether the judgment was swayed at all, but whether it was 'substantially' swayed."

We conclude that the judgment was not "substantially swayed" by the court's erroneous finding that Jenkins admitted that the signatures were not those of William or Benjamin Strauss. The record shows that the core of this case is breach of fiduciary duty, not fraud, and all of the damages can be traced to Jenkins' breach

of that fiduciary duty. Indeed, before it even discussed the issue of fraud, the court concluded that Mr. Jenkins had breached the terms of the oral listing agreement, as well as his duties as an agent, and that William was "entitled to damages for the money lost to him and to make him whole pursuant to the original listing agreement."

Although the court erroneously found that Jenkins had admitted that the signatures on the sales contract were not William and Benjamin Strauss's, we can be certain that William did not sign his name, since his medical condition effectively precluded his ability to do so. Benjamin Strauss, as discussed above, explained in detail why he was certain that neither signature was valid. But even if Benjamin had somehow been tricked into placing his and his brother's signature on the sales contract, the record shows that, as a result of Jenkins' breach of his fiduciary duty, Benjamin was unaware of the terms contained in the sales contract. Jenkins' entire course of dealing in this matter establishes that he made no effort to ensure that Benjamin understood the terms of the sale of the Nash Street house. On the contrary, Jenkins left Benjamin uninformed about the terms of this transaction, arranged for Brooks to have the costs of her closing and her consumer accounts covered from the proceeds of the sale, permitted a trust in the amount of $32,500 to be placed on the house, profited himself from the double commission that he received from this transaction, and generally ignored Benjamin's directions with respect to the need to realize at least $120,000 in cash from the sale. The court's ultimate conclusion that Jenkins had breached his fiduciary duty to the Strauss brothers does not depend on Jenkins having actually

---

8. We note the transcripts were not prepared until after the trial court issued its decision and Jenkins had filed an appeal, and were therefore unavailable to the trial court.

forged their signatures on the sales agreement. Rather, it rests on his entire course of conduct in connection with this sale, from the absence of a listing agreement, to the absence of a written explanation of the dual representation, to the outright breach of his duty to carry out the terms dictated by his client.

## DAMAGES

The court concluded that because of Jenkins' breach of his fiduciary duties to the Strausses and his failure to comply with the terms of the oral contract, damages were appropriate. The damages awarded, amounting to $24,842.97, included $5,971.18 for the payment of Brooks' accounts with Sears, Wards and Norwest; $7,880 for the payment of Brooks' commission to Jenkins; $3,000 for the moving credit; and $191.79 for the payment of her property tax. While the court recognized that the absence of a listing agreement does not automatically eliminate the right of a broker to obtain a commission, it concluded that Jenkins' breach of his fiduciary duties, including his failure to obtain a written listing agreement, his failure to obtain written consent for dual agency representation, and his negotiation of terms unauthorized by the sales agreement should result in his forfeiting his $7,800 broker's commission on this transaction. Thus, the total damages awarded totaled $24,842.97.[9] These damages are squarely supported by the record.

Accordingly, for the reasons stated herein, the trial court's order is hereby

*Affirmed.*

---

9. We note that while the record is not entirely clear, it appears that by the time of trial, the second trust on the home had been paid off,

and that William had received at least some payment from that source.